UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ROLAND GRAHAM,

       Petitioner,        20-cv-2423 (PKC)

  -against-          OPINION AND ORDER

THOMAS DECKER, in his official capacity as
Director of the New York Field Office of U.S.
Immigration & Customs Enforcement; CHAD
WOLF, in his official capacity as Acting
Secretary, U.S. Department of Homeland
Security; and CARL E. DUBOIS, in his official
capacity as Sheriff of Orange County, New York,

      Respondents.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

  Roland Graham is a lawful permanent resident of the United States currently held in mandatory detention by United States Immigration and Customs Enforcement ("ICE") at the Orange County Correctional Facility (the "OCCF") in Orange County, New York. His removal proceedings are pending.

  On March 19, 2020, Graham filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, which seeks his immediate release from custody pursuant to the Court's inherent powers as set forth in Mapp v. Reno, 241 F.3d 221 (2d Cir. 2001).

  On March 20, 2020, the Court granted Graham's application for an Order to Show Cause, and directed the respondents to show cause why a writ of habeas corpus and preliminary injunction relief ought not be granted. (Docket # 3.) Respondents filed papers in opposition on March 31, 2020 and Graham filed reply papers on April 7, 2020. (Docket # 10, 15.) The parties

filed additional submissions to the record. (Docket # 18-23.) The Court conducted a telephonic hearing on April 10, 2020.

Graham, who is 46 years old, asserts that five preexisting health conditions place him at a heightened risk of death or severe illness from COVID-19: stomach ulcers, osteoarthritis, a cyst on his face, persistent depressive disorder, and post-traumatic stress disorder. (Pet. ¶¶ 54-56.) He urges that these conditions compromise his immunity to the virus, and, at the telephonic hearing, asserted that his risks are also heightened by his status as a male, an immigrant detainee, his age and his race. He urges that possible infection from COVID-19, combined with his vulnerabilities, create a serious medical need to which respondents have been deliberately indifferent in violation of the Fifth and Fourteenth Amendment's guarantee of due process. He separately asserts that the conditions of his confinement amount to punitive measures that violate the due process afforded to civil detainees under the Fifth and Fourteenth Amendment.

The Court recognizes the seriousness of Graham's conditions and the threats posed by COVID-19. However, he has not submitted evidence demonstrating that his health conditions or other status place him at a heightened risk of complications caused by COVID-19 for the purposes of a due process analysis. Separately, he has not demonstrated that respondents have shown deliberate indifference to his serious medical needs. The record has established that the OCCF houses detainees in single-occupancy cells of approximately 98 square feet, with one bed per cell; that the OCCF provides detainees with soap and cleaning supplies; that it has posted signs imploring detainees to follow social-distancing practices; and that the OCCF as a whole is at approximately half of its occupancy capacity. Immigration detainees are separately housed at

OCCF and as of April 9, one immigration detainee was being monitored for Covid-19 symptoms and there have been no confirmed cases among the immigration detainees at the OCCF.

For the reasons that will be explained, the Court concludes that Graham has not shown a clear and substantial likelihood of success on the merits or the likelihood of substantial harm in the absence of injunctive relief. The motion for a preliminary injunction will therefore be denied. The Court similarly concludes that Graham has not demonstrated that he should be granted immediate release pursuant to the Court's inherent authority as articulated by Mapp.

BACKGROUND.

Graham is a 46-year-old lawful permanent resident who is originally from Jamaica and has resided in the United States since 1993. (Pet. ¶ 2.)

On August 13, 2019, ICE served Graham with a Notice to Appear, which commenced removal proceedings against him. (Aniyikaiye Dec. ¶ 11.) The notice asserted that Graham was removable pursuant to two criminal convictions: the first for the violation of a law relating to a controlled substance, 8 U.S.C. § 1227(a)(2)(B)(i), and the second for violating an order of protection involving credible threats of violence, repeated harassment or bodily injury, 8 U.S.C. § 1227(a)(2)(E)(ii). (Id. ¶ 11; see also id. ¶¶ 6-10 (reciting Graham's criminal history).) On February 20, 2020, an immigration judge denied Graham's applications for relief and ordered that he be removed to Jamaica. (Id. ¶ 12.) Graham has filed an appeal to the Board of Immigration Appeals, which remains pending. (Id. ¶ 13.) Graham is detained in the OCCF in Goshen, New York. (Pet. ¶ 22.) He is subject to mandatory detention under 8 U.S.C. § 1226(c). (Aniyikaiye Dec. ¶ 11.)

Graham asserts that, given his preexisting conditions, his continued detention in the OCCF violates the due process guaranteed by the Fifth and Fourteenth Amendments in two

respects. He urges that as a high-risk person, the respondents are unable to provide him with adequate medical care and protection, and have acted with deliberate indifference to his serious medical needs. (Pet. ¶¶ 84-87.) He separately urges that the conditions of his confinement are punitive, which violates the due process guarantee against imposing punishment on persons in civil confinement. (Pet. ¶¶ 80-83.) He asserts that his immune system is vulnerable to infection because he suffers from stomach ulcers, osteoarthritis, a cyst on his face, persistent depressive disorder, and post-traumatic stress disorder. (Pet. ¶¶ 54-56.) During the telephonic hearing, his counsel asserted that the combination of these ailments, plus demographic factors including his age, sex, race and status as an immigrant detainee, increase his risk profile

The COVID-19 virus is highly communicable, and presents a risk of serious health complications and even death, which increases with age and the presence of certain preexisting conditions. (Pet. ¶¶ 18-20.) The Center for Disease Control ("CDC") has identified higher-risk persons as those who are age 65 or older, as well persons with chronic lung disease, serious heart disease, severe obesity, kidney and liver disease, and compromised immune systems.[1] The Petition asserts that detention facilities confront additional challenges in limiting the virus's transmission because occupants are limited in their ability to enforce social-distancing measures and effective sanitation practices. (Pet. ¶¶ 35-38.)

Respondents have submitted the April 3, 2020 declaration of Lawrence Catletti, the captain of corrections administration at the OCCF. (Docket # 18.) He states the following under penalty of perjury:

- The OCCF has a maximum capacity of 802 detainees. As of April 3, 2020, it held 427 detainees, including 125 ICE detainees. Three of the facility's 19 units house ICE detainees, who are housed separately from the OCCF's criminal inmates. (Catletti Dec. ¶¶ 4-5.)

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

- ICE detainees are assigned to single-occupant cells approximately 98 square feet in size, with one bed each. (Id. ¶ 6.)
- On-site medical staff includes one medical doctor, one psychiatrist, ten registered nurses, eleven licensed practical nurses, four social workers, and two mental health nurse practitioners. (Id. ¶ 7.)
- Units are cleaned at least three times a day using disinfectants recommended for COVID-19 sanitation. (Id. ¶ 9(j).) The facility provides units with soap, hand sanitizer, disinfectants, and hot water, and encourages their use by staff and detainees. (Id.)
- The OCCF has instructed staff and detainees on COVID-19 protection protocols, including handwashing and the need to seek medical care if they feel unwell. (Id. ¶ 9(k).) Posters advise detainees to practice preventative measures, including social distancing. (Id.)
- On March 23, 2020, the OCCF indefinitely suspended the intake of new ICE detainees. It has suspended visitations and non-essential access to the facility. (Id. ¶ 9(a), (c).)
- Vendors and staff members receive medical screenings prior to entering the facility. (Id. ¶ 9(d).) All new intakes also receive a medical screening. Any inmate showing symptoms is placed in medical isolation. (Id. ¶ 9(b).)
- Meals are served individually to detainees in their cells. (Id. ¶ 9(e).)
- Detainees are permitted to leave their cells for up to 10 hours a day and have access to 4,480 square feet of recreational space. Catletti states that inmates are not intermingling during this period, and that the amount of space is sufficient to observe social distancing. (Id. ¶ 9(e).)
- As of April 2, 2020, no inmate or detainee housed at the facility had tested positive for COVID-19. (Id. ¶ 9(l).) One staff member had tested positive for COVID-19, and was quarantined at home. (Catletti Dec. ¶ 9(i).) That individual had no contact with ICE detainees. (Id. ¶ 9(l)(3).)

On April 10, 2020, the respondents submitted the Declaration of Thomas Flynn, an ICE supervisory detention and deportation officer. (Docket # 20.) It is dated April 9, 2020, and was prepared in connection with Bentick v. Decker, 20 Civ. 2759 (ER) (S.D.N.Y.). Flynn states that, as of April 9, 2020, one ICE detainee at the OCCF has displayed symptoms of COVID-19 and is under medical observation, but that there are no confirmed cases at the facility. (Flynn Dec. ¶ 13.) He states that every unit of the facility is provided with hand sanitizer, soap and disinfectants, including the direct provision of hand sanitizer to detainees. (Flynn Dec. ¶ 15.)

LEGAL STANDARD.

A court will grant preliminary injunctive relief if the movant demonstrates "that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest . . . ." Am. Civil Liberties Union v. Clapper, 785 F.3d 787, 825 (2d Cir. 2015). "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018) (quoting N.Y. Civil Liberties Union v. N.Y.C. Transit Auth., 684 F.3d 286, 294 (2d Cir. 2012)); see also Coronel v. Decker, 2020 WL 1487274, at *2 (S.D.N.Y. Mar. 27, 2020) (Nathan, J.) (applying mandatory injunction standard to section 2241 petition seeking immediate relief from immigration detention).[2]

Separately, Mapp provides that "the federal courts have inherent authority to admit to bail individuals properly within their jurisdiction." 241 F.3d at 226. To obtain such relief, "[t]he petitioner must demonstrate that the habeas petition raise[s] substantial claims and that extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy effective." Id. (second alteration in original) (quoting Grune v. Coughlin, 913 F.2d 41, 44 (2d Cir. 1990)).

---

[2] Graham's proposed Order to Show Cause sought preliminary injunctive relief, but his memorandum of law refers to both a preliminary injunction and temporary restraining order. The parties agree that the preliminary injunction standard governs any application for a temporary restraining order. See, e.g., Andino v. Fischer, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) ("It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction.") (Marrero, J.). At the telephonic hearing, counsel confirmed that their application seeks a preliminary injunction and not a temporary restraining order.

LIKELIHOOD OF SUCCESS ON THE MERITS.

    A.  Deliberate Indifference.

        1.  Serious Medical Needs.

For the purposes of Graham's deliberate indifference claim, the Court applies the legal standard thoroughly explained in Coronel, 2020 WL 1487274, at *3. Due process requires that persons "in civil detention deserve at least as much protection as those who are criminally incarcerated," and they demonstrate deliberately indifferent conduct if they show 1.) "a serious medical need" and 2.) "that the Defendants acted with deliberate indifference to such needs." Charles v. Orange Cty., 925 F.3d 73, 82, 86 (2d Cir. 2019).

"The serious medical needs standard contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." Id. at 86. A detainee may show a serious medical need based on the imminent risk of infection from a communicable disease, even if he displays no current symptoms and the possible infection may not affect all of those exposed. Helling v. McKinney, 509 U.S. 25, 33 (1993).

Graham states that "[b]ecause of his multitude of medical conditions, including a stomach ulcer, acute osteoarthritis, and diagnoses of Persistent Depressive Disorder and Post-Traumatic Stress Disorder, the chance of him developing serious medical complications are particularly high." (Docket # 5 at 6.) Graham's reply memorandum cites to articles that describe a potential for weakened immunity as a result of these conditions, but he does not describe a personal history of immunodeficiency. (Reply at 3-5.) The Court takes judicial notice that, as mentioned, the CDC does not list Graham's ailments as presenting a heightened risk for COVID-

19 complications. The Mayo Clinic does not list conditions such as Graham's when describing higher-risk immunodeficiencies.[3]

Other courts in this District have identified a serious medical need warranting the immediate release of persons who demonstrate specific maladies that present a heightened risk of complications from the virus. See Coronel, 2020 WL 1487274, at *1 (describing petitioners' medical histories of type 2 diabetes, as well as heart, lung, kidney and liver maladies, which respondents did not dispute placed them at heightened risk); Avendaño Hernandez v. Decker, 2020 WL 1547459, at *2 (S.D.N.Y. Mar. 31, 2020) (describing petitioner's heart and kidney ailments, which respondents did not dispute placed him at heightened risk) (Oetken, J.); Basank v. Decker, 2020 WL 1481503, at *1, 3 (S.D.N.Y. Mar. 26, 2020) (describing petitioners' histories of type 2 diabetes and heart and lung maladies) (Torres, J.); Nikolic v. Decker, 20 Civ. 2500 (LGS) (Apr. 3, 2020 Tr. at 11, 19) (describing blood tests that "clearly show liver disease" arising from hepatitis C and "a consensus in the medical community" the persons with hepatitis C are compromised) (Schofield, J.); but see Rosemond v. Decker, 19 Civ. 9657 (NSR) (LMS) (Docket # 20) (Report and Recommendation of Smith, M.J., recommending denial of Mapp relief where petitioner did not demonstrate that his schizophrenia, depression and history of alcohol abuse presented a heightened risk of harm from the novel coronavirus).

While the Court acknowledges the seriousness of Graham's conditions, he has not demonstrated a likelihood of success to his claim that, were he to remain in immigration detention at OCCF, his conditions and risk factors, individually or taken in their totality, would place him at a substantially heightened risk of either contracting Covid-19 than other members of

---

[3] The Mayo Clinic states that immunity may be compromised by cancer treatments, smoking, bone marrow or organ transplants, HIV/AIDS and prolonged use of prednisone or similar drugs. See https://www.mayoclinic.org/coronavirus-who-is-at-risk/art-20483301

the general population or more severe consequences to him than members of the general population if he were to contract the disease.

2. Deliberate Indifference.

Graham also has not demonstrated a clear and substantial likelihood of success in asserting that the respondents have acted with deliberate indifference to a serious medical need. "A plaintiff must show 'something more than mere negligence' to establish deliberate indifference in the Fourteenth Amendment context." Charles, 925 F.3d at 87 (quoting Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996)). "[A] detainee asserting a Fourteenth Amendment claim for deliberate indifference to his medical needs can allege either that the defendants knew that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants should have known that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." Id. (emphasis in original). Such conduct "'involves culpable recklessness, i.e., an act or a failure to act . . . that evinces a conscious disregard of a substantial risk of serious harm.'" Id. (quoting Cuoco v. Moritsugu, 222 F.3d 99, 107 (2d Cir. 2000)).

Graham's petition describes the challenges faced by individuals who are detained in a facility such as the OCCF. (Pet. ¶¶ 29-50.) Among other things, it characterizes detention facilities as having "[o]vercrowding and deficient medical care," the difficulty of enforcing social-distancing norms, and asserts that "it will be impossible" for Graham and others to routinely wash his hands or distance himself from others. (Pet. ¶¶ 36-37, 39.) Specific to the OCCF, it asserts that, as of March 19, detainees had limited access to soap; no gloves or hand sanitizer; and inadequate cleaning supplies. (Pet. ¶ 44.) It states that the OCCF has continued to accept new pre-trial detainees and has limited access to medical care due to the possibility of

persons compromised by COVID-19. (Pet. ¶¶ 44-47.) It also notes that detainees are prevented from personal interactions with visitors and that the facility's teleconferencing system is unreliable. (Pet. ¶ 49.) The petition asserts that respondents have failed to take necessary or appropriate precautions to protect Graham. (Pet. ¶ 87.)

Courts reviewing applications for a detainee's release have found a likelihood of success on the merits where the petitioner shows that officials are unable or unwilling to take preventative measures that minimize the risk of infection to persons known to have serious, unmet medical needs. See, e.g., Coronel, 2020 WL 1487274, at *5-6.

In opposition to the motion, respondents have submitted detailed descriptions of the OCCF's protocols and resources for responding to COVID-19. The Court summarized those measures above, which were described in declarations submitted under penalty of perjury. The Court places significant weight on the declarants' descriptions of the single-occupant cells assigned to ICE detainees, the availability of hand sanitizer and soap, the access to on-site medical personnel, and the encouragement and feasibility of following social-distancing measures. The Court also places weight on the fact that the facility indefinitely suspended intake of new ICE detainees on March 23, 2020, has suspended personal visits to the facility, screens vendors and staff, and has no confirmed cases of COVID-19.

The Court also takes judicial notice that, as of April 13, 2020, an ICE website tracking infections at its affiliated facilities reports no ICE detainee or employee infections at the OCCF. See https://www.ice.gov/coronavirus.

The Court also affords some weight to the declarations annexed to Graham's reply memo. They include the declaration of an attorney, Andrea Sáenz, who states that she has closely monitored conditions at the OCCF based on staff calls with clients, and that she

understands detainees continue to mingle and play sports in spite of preventative measures. (Docket # 15-5.) She states that detainees also have reported limited access to soap and no cleaning supplies. (Id.) The Court has considered the declarations of three detainees who were respectively released from the OCCF on March 25, 27 and April 1, 2020. (Docket # 15-6, 7, 8.) They describe suspected instances of COVID-19 in the facility, social mingling between detainees and limited access to soap and cleaning supplies. (Id.) However, the conditions described by those declarations pre-date the declarations of Catletti and Flynn, and lack the detail of the descriptions contained in the declarations submitted by the respondents.

Graham has not demonstrated that defendants knew or should have known of a substantial risk posed to him and that they subsequently failed to take adequate or effective preventative measures. See Charles, 925 F.3d at 87. They do not show conduct amounting to culpable recklessness or a failure to act that evinces a conscious disregard of serious harm. Id. The Court therefore concludes that Graham has failed to demonstrate a clear and substantial likelihood of success of showing that the respondents are deliberately indifferent to his medical needs.

    B. Punitive Detention.

Graham separately asserts that he is being held in punitive detention. (Pet. ¶¶ 80-83.) Detaining a person who is not serving a term of imprisonment in conditions of confinement that punish the individual, rather than merely hold him, violates due process. See, e.g., Iqbal v. Hasty, 490 F.3d 143, 168 (2d Cir. 2007) ("Pretrial detainees have not been convicted of a crime and thus may not be punished in any manner – neither cruelly and unusually nor otherwise.") (quotation marks omitted), rev'd on other grounds, Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017) ("A pretrial detainee may not be punished at

all under the Fourteenth Amendment, whether through the use of excessive force, by deliberate indifference to conditions of confinement, or otherwise.").

"[T]o establish an objective deprivation, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, which includes the risk of serious damage to physical and mental soundness." Id. at 30 (quotation marks and internal citation omitted). There is no "static test" for identifying such a deprivation. Id. A detainee may not be deprived of "basic human needs," and may not be exposed to conditions that impose an unreasonable risk of serious damage to future health. Id. "Unsanitary conditions, especially when coupled with other mutually enforcing conditions, such as poor ventilation and lack of hygienic items (in particular, toilet paper), can rise to the level of an objective deprivation." Id.

For the reasons explained, the Court concludes that Graham has not demonstrated a clear and substantial likelihood of success in showing that the conditions of his confinement are punitive. The record does not include evidence that tends to show Graham's conditions of confinement, when viewed with his individualized health circumstances, constitute punishment. The Court therefore concludes that he has not demonstrated a likelihood of success on his claim that he is being held in punitive detention.

RISK OF IRREPARABLE HARM.

In urging that he will suffer irreparable harm absent immediate release from custody, Graham points to his preexisting medical conditions, the risk of a COVID-19 outbreak at the OCCF and the claimed ineffectiveness of the facility's preventative measures. (Pet. Mem. at 5-6; Reply at 2-9.)

The deprivation of a constitutional right is an irreparable harm. See, e.g., Connecticut Dep't of Envtl. Prot. v. O.S.H.A., 356 F.3d 226, 231 (2d Cir. 2004). Imminent risk to life, health or safety is also an irreparable harm. See Coronel, 2020 WL 1487274, at *3.

For the reasons explained, the Court concludes that Graham has not demonstrated that his age or health conditions place him at heightened risk of complications arising from COVID-19. He also has not demonstrated that the conditions and procedures at the OCCF currently present an imminent risk to his life, health or safety, or that respondents have been deliberately indifferent to his serious medical needs.

The Court therefore concludes that Graham has not demonstrated that he will suffer irreparable harm absent immediate release.

Because the Court concludes that Graham has not demonstrated a clear and substantial likelihood of success on the merits or irreparable harm, it does not weigh the balance of equities and the public interest in granting his application.

GRAHAM'S APPLICATION FOR RELEASE PURSUANT TO MAPP.

Graham seeks his immediate release under the Court's inherent authority to grant bail to habeas petitioners. See Mapp, 241 F.3d at 223; Pet. ¶¶ 73-79. His reply memo urges that, in the even that Graham's application for preliminary injunctive relief is denied, the Court should release him on bail pending final adjudication of his petition. (Reply at 12.) Graham states that, if released, he will reside with his mother, a U.S. citizen who lives in Wappinger Falls, New York. (Docket # 22.)

Coronel set forth the standard for granting relief under Mapp:

In Mapp v. Reno, the Second Circuit held "that the federal courts have inherent authority to admit to bail individuals properly within their jurisdiction" including immigration detainees petitioning for habeas relief. 241 F.3d 221, 226 (2d Cir. 2001). But "this power is a limited one, to be exercised in special cases only." Id. To

> determine a petitioner's "fitness for bail" pending adjudication of a habeas petition, the Court "must inquire into whether 'the habeas petition raises substantial claims and [whether] extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy effective.'" Id. at 230 (quoting Iuteri v. Nardoza, 662 F.2d 159, 161 (2d Cir. 1981)) (alterations in original). Additionally, some courts applying Mapp also consider "whether the petitioner has demonstrated a likelihood of success on the merits of his or her petition." Boddie v. New York State Div. of Parole, 2009 WL 1531595, at *1 (S.D.N.Y. May 28, 2009).

2020 WL 1487274, at *8. "Severe health issues have been the prototypical but rare case of extraordinary circumstances that justify release pending adjudication of habeas." Id. (collecting cases). Coronel weighed whether the petitioners' due process claims were substantial and demonstrated extraordinary circumstances warranting relief, and concluded that they did. Id. at *8-9. At the telephonic hearing, counsel to Graham stated that any relief under Mapp turned on the merits of his two due process claims.

For reasons explained in connection with the motion for injunctive relief, the Court concludes that Graham's evidentiary showing does not support a finding that there is substantial support for his claims for habeas relief, i.e. deliberate indifference to his medical needs and punitive detention in violation of the Due Process Clause The Court recognizes that the COVID-19 pandemic is, itself, extraordinary and that it affects Graham personally, as well as the operations and personnel of the OCCF. However, Graham has not demonstrated that he personally faces a heightened risk of complications or that the conditions and procedures in place at the OCCF are constitutionally deficient. The Court therefore denies his application for bail brought pursuant to Mapp.

CONCLUSION.

For the reasons explained, the petitioner's application for a preliminary injunction is DENIED. The Clerk is directed to terminate the motion. (Docket # 5.)

SO ORDERED.

_P. Kevin Castel_
United States District Judge

Dated: New York, New York
April 13, 2020